FILED

07/28/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 24-0046

DA 24-0046

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 167

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

ROBERT LEE MORRISSEY JR.,

      Defendant and Appellant

APPEAL FROM:   District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DC 21-874
Honorable Ashley Harada, Presiding Judge

COUNSEL OF RECORD:

     For Appellant:

        Ryan P. Archibald, Attorney at Law, Warrenton, Oregon

     For Appellee:

        Austin Knudsen, Montana Attorney General, Selene Koepke, Assistant Attorney General, Helena, Montana

        Scott Twito, Yellowstone County Attorney, Billings, Montana

Submitted on Briefs:  April 8, 2026

Decided:  July 28, 2026

Filed:

_____
                   Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Robert Lee Morrissey Jr. (Morrissey) was convicted of three counts of felony sexual assault after a jury trial in the Thirteenth Judicial District Court, Yellowstone County. He appeals the District Court's denial of his motion after the presentation of the State's evidence to dismiss one of the three counts. We consider:

*Did the District Court err by denying Morrissey's motion to dismiss Count I?*

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 Morrissey, born in 1963, lived in several places before turning 18, including Laurel, Montana. After high school, he joined the military and left Montana. At that time, he and his sister, R.M., had become estranged. However, the siblings reunited in 2009, after which Morrissey would return annually to Laurel in the summer to visit family, often bringing his daughter and granddaughter. During those trips, Morrissey and his family would stay with his mother, who resided across the street from R.M., and R.M.'s daughter, S.M., who was born in 2006 and was a niece to Morrissey. Morrissey's last visit was in 2017.

¶3 Over a period beginning in 2017, S.M. started to exhibit personality and behavioral changes, including isolation, self-harm, and depression. In 2020, S.M. was in eighth grade and attended a school assembly about sexual assault. As she was returning to class, she broke down because, as she later explained, the assembly "brought back some memories." S.M. went to the school counselor, to whom she disclosed that Morrissey had sexually assaulted her. This led to a report to the Department of Health and Human Services and a police investigation. S.M. participated in a forensic interview in which she identified

2

Morrissey as the perpetrator of three assault incidents against her. As a result of the investigation and S.M.'s forensic interview, the State brought charges against Morrissey for three counts of sexual assault. Police collected no physical evidence.

¶4 At the April 2023 trial, the State called Dr. Wendy Dutton as an expert witness on the prolonged effects of sexual assault upon a child. In response to a question of whether children ever delay disclosure of sexual abuse, Dr. Dutton stated it was common for children "to wait weeks, months, or even years before they tell someone that abuse is happening." She further explained that people remember the details of mildly traumatic events better than severely traumatic events because they do not pay as much attention to details that "weren't necessary for [their] survival," and that such factors "can compromise the child's memory for details of what happened."

¶5 S.M. testified that when she was in fifth grade, she helped Morrissey babysit his granddaughter at her grandmother's house. She stated that they watched a movie, during which Morrissey's granddaughter sat on the couch and Morrissey and S.M. sat on the floor. S.M. stated that at some point during the movie, Morrissey took her hand and she remembered "[f]eeling something squishy" near his waist. When asked what the "squishy" thing was that she touched, S.M. stated that it was Morrissey's "ding-along[.]," and later specified it was his penis. S.M. testified that "red flags" went off, causing her to pull her hand away, stand up, and leave the room. On her way out of the room, S.M. testified that she "heard a zipper sound[,]" which she believed was Morrissey zipping his pants.

¶6 S.M.'s mother, R.M., testified about Morrissey's last visit to Montana in the summer of 2017. One day during this visit, some of the family attended a performance of Montana

3

Shakespeare in the Park. R.M. related that Morrissey, who stayed home, asked her if S.M. could come over to their mother's house to assist him with babysitting his granddaughter. R.M. testified that when S.M. returned, she seemed "confused" and "unsure of what had happened, kind of down," and that S.M. then disclosed some of the details of Morrissey's assault. R.M. testified that she and her husband were upset by S.M.'s disclosure, and she messaged Morrissey and asked to speak with him outside his mother's home. When she confronted Morrissey with S.M.'s disclosure, she said that he acted "shocked." R.M. stated that Morrissey admitted putting S.M.'s hand into his pocket, and that he claimed S.M. must have felt the candy he kept in his pocket. After her continued questioning, R.M. testified that Morrissey crouched down, put his head in his hands and said, "you don't know how many times I have had a gun in my mouth wanting to pull the trigger." R.M. believed Morrissey said this "[t]o make [her] feel guilty[.]" At a family gathering the next day, R.M. stated that Morrissey made a production out of avoiding physical contact with S.M. R.M. testified she was not aware of the other incidents, and that she and her husband chose not to involve the police because they thought it was an isolated occurrence and wanted to spare S.M. the trauma of a legal proceeding. Morrissey did not thereafter voluntarily return to Laurel.

¶7     S.M. also testified she had been assaulted by Morrissey prior to the 2017 babysitting incident. That incident took place when she was either in the third grade or the fourth grade, and likewise occurred while she was watching a movie in her grandmother's living room. S.M. testified she and Morrissey were again sitting on the floor but this time she was sitting between his legs. While sitting there, Morrissey's hand, which had been resting

4

on her stomach, moved down her body, underneath the waist band of her pants, and beneath her underwear. She testified that his hand came to rest on "my pelvis." The prosecutor asked, "[t]he pelvis can encompass kind of a larger part of a person's anatomy. Do you have another word or a word that you used in the past to describe it?" S.M. answered, "[v]agina, I guess."

¶8 S.M. then testified regarding a third incident for which she had difficulty remembering details. She began her testimony about the third incident by describing "a dirty feeling" that she associated with all of the incidents, including the third:

> [S.M.]: There is a, like, I guess the easiest way to, like, describe it is, like, a dirty feeling. That kind of accompanies the things that happened. And there is, like, that same kind of, like, dirty feeling like one other time. But I don't necessarily remember exactly what happened.

The prosecutor asked S.M. if she remembered telling the forensic interviewer about the third incident. She responded that she "vaguely" remembered, but could not remember what she specifically said, after which the prosecutor showed her the transcript of the forensic interview to refresh her memory of that statement. Her testimony then continued:

> Prosecutor: So, [S.M.], I will ask you again, what did you disclose to the forensic interviewer about this sort of third assault?

> [S.M.]: To the forensic interviewer, I said that I don't remember very much like what was happening. But that we were standing and his hand went to the same spot.

> Prosecutor: Okay. And do you remember where all of these incidents occurred?

> [S.M.]: Yes, I think so.

> Prosecutor: Where did they all happen?

5

[S.M.]: All of that happened [at] my grandma's house.[1]

¶9　During cross-examination, defense counsel conducted the following exchanges with S.M.:

> Defense: So that second incident, did I hear you and I could be wrong, so I just want to clarify, did you think that the second incident, let's call it the middle incident happened two years prior?
>
> [S.M.]: I'm not 100 percent sure when it happened. I said that it was around third or fourth grade so one or two years prior.
>
> Defense: And you said at that time you don't know who was in the house, correct?
>
> [S.M.]: Correct.
>
> Defense: Who could have been there?
>
> [S.M.]: [names relatives] Me – plus me and him. But I don't remember who all was there.
>
> Defense: And you don't remember if anybody was in the room?
>
> [S.M.]: I don't think anyone else was in the room.
>
> Defense: You indicated that you were watching a movie?
>
> [S.M.]: Yes.

---

[1] Following this exchange, S.M. clarified that the "first incident," sometimes referred to as the "zipper incident," was the first one she explained in her testimony and had occurred when she was in the fifth grade, thus being, chronologically, the last incident to occur, in 2017. This correlated to Count III of the Information. The "second incident," sometimes referred to in the transcript as the "middle incident," occurred when S.M. was in the third or fourth grade and is the basis for Count II, while the "third incident" occurred while she and Morrissey were standing up and is the basis for Count I, challenged on appeal. S.M. did not correlate the allegations of Count I to a school grade year. The timeframe for each of the charges was listed in the Information as 2015-2017, and the prosecutor explained that the counts were charged in chronological order, although S.M. testified about them in reverse order. Jury Instruction No. 4 listed the three charges as alleged to have occurred in Yellowstone County from 2015-2017, and Jury Instruction No. 9 instructed that each charge was a distinct offense that must be decidedly separately.

Defense: *And his hand slowly moved down and ultimately made contact with your vagina. Is that your testimony?*

[S.M.]: *Yes.*

.    .    .

Defense: [A]nd I'm going to jump now to the third incident. At the time of the second incident, do you remember the third?

[S.M.]: I don't know.

Defense: I think with that third – I think you said something to the effect that you don't remember exactly what happened, right?

[S.M.]: Yes.

Defense: *You remember standing and you remember some sort of contact with the same area?*

[S.M.]: *Yes.*

Defense: You don't know if it was accidental contact?

[S.M.]: I guess not. No, I don't know. If it was accidental, I don't know.

(Emphasis added.)

¶10     Following the close of the State's case-in-chief, defense counsel moved for a directed verdict or dismissal of the third or "standing" incident charge, Count I, arguing as follows:

> The alleged victim in this case described she was standing up. She didn't remember exactly what happened. *Just remembered or recalled that my client's hand was in the same area. By the same area, she was referencing the second incident.* On cross-examination, she was asked if she remember [sic] the exact circumstances. She didn't remember the exact circumstances, cannot be sure whether the contact was accidental, incidental, or intentional.

(Emphasis added.)

7

¶11 The State argued in response:

> [S.M.] was able to testify after having her memory refreshed that there was this incident where she was standing and her – the Defendant's hand went to the same spot. There – *the jury, the trier of fact could reasonably conclude that that is the same exact conduct as the other offense in which he put his hands in her pants and touched her vagina.* Although [S.M.] could not say if it was accidental or incidental, the jury could conclude that there would be no reasonable explanation for her uncle to have put his hand in the same spot on her vagina. She was able to testify that that occurred at her grandmother's house in Yellowstone County. . . . [S]he described feeling dirty, which the jury could conclude she felt uncomfortable with that type of touch that would have been in the same spot as the other touching of her vagina.

(Emphasis added.) The District Court noted that the evidence was to be viewed in a light most favorable to the State, and denied the motion, stating that "a rational trier of fact should make a decision" on Count I.

¶12 Morrissey testified in his own defense and acknowledged he "may" have made a statement to R.M. to the effect of putting a gun in his mouth. He denied touching S.M., specifically and individually rejecting the allegations of all three incidents. The jury found Morrissey guilty of all three counts of sexual assault.

¶13 Morrissey appeals.

## STANDARD OF REVIEW

¶14 We review a district court's denial of a motion for directed verdict de novo. *State v. Skinner*, 2007 MT 175, ¶ 14, 338 Mont. 197, 163 P.3d 399 (citation omitted). "A directed verdict is only appropriate if, viewing the evidence in a light most favorable to the prosecution, there is no evidence upon which a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Skinner*, ¶ 14 (citation omitted).

8

## DISCUSSION

¶15     *Did the District Court err by denying Morrissey's motion to dismiss Count I?*

¶16     Morrissey argues the District Court erred by denying his motion to dismiss Count I. He explains that "the testimony as to Count 1 is that . . . Morrissey's hand went to the same spot, implying that his hand went to the area of S.M.'s vagina," but argues that "[n]o witness testified if Morrissey actually touched S.M., only that his hand went to the same spot," and that no evidence was provided "that proved that Morrissey made knowing or purposeful contact with the sexual or intimate part of S.M."   The State answers that "S.[M.]'s testimony that Morrissey touched her vagina while she was standing was clear when viewed in conjunction with her earlier testimony," and that the prosecution "provided the jury with sufficient evidence that Morrissey touched her vagina, under her clothes, on two separate occasions."

¶17     Due process of law necessarily encompasses "the right to have the state prove every element of a charged offense beyond a reasonable doubt, and the presumption of innocence." *State v. Daniels*, 2019 MT 214, ¶ 32, 397 Mont. 204, 448 P.3d 511 (citation omitted).   A person commits the offence of sexual assault if they "knowingly subject[] another person to any sexual contact without consent[.]"   Section 45-5-502(1), MCA. Here, regarding Count I, the jury was instructed that, to convict Morrissey of sexual assault, it must find the State proved that Morrissey subjected S.M. to sexual contact, that the sexual contact was without S.M.'s consent, and that Morrissey acted knowingly.[2]

---

[2] The jury was separately instructed to determine whether the State had proved beyond a reasonable doubt that S.M. was less than 14 years old and Morrissey was three or more years older than S.M.

¶18 The finder of fact "evaluate[s] the credibility of witnesses, weigh[s] the evidence, and ultimately determine[s] which version of events should prevail." *State v. Burnett*, 2022 MT 10, ¶ 15, 407 Mont. 189, 502 P.3d 703 (citing *State v. Bekemans*, 2013 MT 11, ¶ 20, 368 Mont. 235, 293 P.3d 843). "A jury may consider all direct and circumstantial evidence, as well as any legitimate inferences that may be legally drawn therefrom, to determine a defendant's culpability." *State v. Christensen*, 2020 MT 237, ¶ 118, 401 Mont. 247, 472 P.3d 622 (citation omitted). "The jury, exclusively, draws inferences from circumstantial evidence and should determine its conclusions on elements of the crime if 'warranted by the evidence as a whole.'" *Christensen*, ¶ 118 (internal citation omitted). "The existence of a mental state may be inferred from circumstantial evidence, including the acts of the accused and facts and circumstances surrounding the offense." *State v. Ernst*, 2025 MT 89, ¶ 22, 421 Mont. 441, 567 P.3d 944 (citation omitted). Thus, our focus is whether, "after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Weigand*, 2005 MT 201, ¶ 7, 328 Mont. 198, 119 P.3d 74 (citation omitted).

¶19 Morrissey's challenge to Count I attempts to narrow the State's evidentiary proof to S.M.'s singular statement that "his hand went to the same spot." However, the jury considers the "evidence as a whole," as well as any "legitimate inferences that may be legally drawn therefrom, to determine a defendant's culpability." *Christensen*, ¶ 118. First, as both parties acknowledged in their dismissal arguments to the District Court, italicized above, and in their appellate arguments, when making this statement S.M. was

referencing her earlier testimony about Morrissey touching her vagina during the second incident. This is also borne out by the context of S.M.'s full testimony on both direct and cross-examination. During cross, defense counsel questioned S.M. about Morrissey making contact with her vagina during the second or "middle" incident, and then said, "I'm going to jump now to the third incident[,]" whereupon counsel directly proceeded to ask S.M., "[y]ou remember standing and you remember some sort of contact with the same area?", to which S.M. answered, "[y]es."

¶20     S.M.'s explanation on direct examination about the third incident that "his hand went to the same spot[,]" and her affirmance on cross-examination that the same contact she had just explained for the second incident also occurred on that third occasion, permitted an inference that Morrissey had likewise made contact with her vagina on this third incident. She testified that the third incident also occurred at her grandmother's house. While S.M. could not say if this contact was accidental or purposeful, answering "I don't know[,]" the jury was entitled to draw an inference from S.M.'s testimony about the incident, including her experiencing the same "dirty feeling" she had felt during the other two incidents, that Morrissey's contact with S.M's vagina was done knowingly. *Ernst*, ¶ 22 ("The existence of a mental state may be inferred from circumstantial evidence, including the acts of the accused and facts and circumstances surrounding the offense.") (citation omitted). As the prosecutor argued in response to the motion to dismiss, "[a] reasonable jury could absolutely conclude that there would be no proper explanation that her uncle would be touching her vagina." The jury was also entitled to reject Morrissey's

11

testimony in which he denied touching S.M. on this and the other two occasions, as lacking credibility.

¶21 "We review a jury's verdict to determine whether sufficient evidence exists to support the verdict, not whether the evidence could have supported a different result." *Weigand*, ¶ 7 (citation omitted). We conclude from review of the record that there is "evidence upon which a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt[]" for Count I. *See Skinner*, ¶ 14 (citation omitted).

¶22 Affirmed.

/S/ JIM RICE

We Concur:

/S/ CORY J. SWANSON
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ KATHERINE M. BIDEGARAY
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON